# MEMPHIS & SHELBY COUNTY BAR ASS'N. v. ASPERO.—242 S. W. (2d) 319.

Western Section.   March 16, 1950.

Rehearing denied May 3, 1950.

Petition for Certiorari denied by Supreme Court, December 9, 1950.

Petition for Certiorari denied by Supreme Court of United States, October 8, 1951. See 72 S. Ct. 61.

10

John L. Exby and W. E. Quick, both of Memphis, for complainant.

Grover N. McCormick, of Memphis, for defendant.

TIPTON, Sp. J.   This suit was instituted in the Chancery Court of Shelby County by the complainant appellee, Memphis and Shelby County Bar Association, Inc., pursuant to a resolution of its Board of Directors, against the respondent appellant, Nell Sanders Aspero, a member of said Association and a practicing attorney at the Memphis Bar, seeking to disbar her from the further practice of law because of the alleged violation by her of Subsections (5) and (2) of Section 9974 of the Code.   At the hearing, the Chancellor sustained the bill, finding that the respondent had violated Subsection (5) by attempting to perpetrate a fraud against the Memphis Street Railway Company in a personal injury suit brought against it by her in the Circuit Court of Shelby County, that she had also violated said Subsection by falsely and maliciously charging Hon. Sam P. Walker, a fellow member of the bar, with fraud in connection with the trial of said suit, and that she had violated Subsection (2) by soliciting legal business, and fixed her punishment upon the first charge at suspension from the practice of law for five

years and at a reprimand upon each of the other charges, and the respondent has appealed to this Court.

The original bill, after setting out the status of the parties, alleges that on April 18, 1945, the respondent filed a $15,000.00 damage suit in the Circuit Court of Shelby County against Memphis Street Railway Company for personal injuries alleged to have been sustained by her in an accident occurring near Cleveland and Madison Streets in Memphis on April 25, 1944, her declaration alleging with respect to her injuries as follows:

"By reason of the negligence aforesaid, Plaintiff was painfully and seriously injured; she was severely shocked and rendered highly nervous, was caused to suffer from digestive disturbances, was bruised on her left arm, left leg and right hip, was also caused to suffer from severe pains in her head, neck, right shoulder, back and abdomen; she was seriously injured in and about the abdomen and female organs, was caused to suffer from irregular and excessive menstruation, and continued so to suffer; she also suffered a strain of her back in the sacro-iliac or sacro-lumbar region, for which she was forced to wear heavy and uncomfortable brace constructed of steel and felt throughout the hot summer months, and for many months thereafter; she was also forced to undergo a prolonged series of physical therapy and diathermy treatments at a local hospital in her efforts to be cured, but still suffers intensely with backache, particularly during cloudy and rainy weather and/or cold weather; said nervousness, together with sleeplessness, continued for many months, in spite of the taking of sedatives which were prescribed therefor; Plaintiff was caused to lose much valuable time from her profession, being still unable to work more than five (5) hours each day; she has expended large sums of money to hospitals and to doctors

in her efforts to be cured, has suffered much physical pain and mental anguish, and will continue so to suffer.''

It further alleges that on July 27, 1946, she filed a $25,000.00 damage suit in the Circuit Court of Knox County against U. G. Turner, doing business as Service Cab Company, for personal injuries alleged to have been sustained by her in an accident occurring in Knoxville on August 18, 1945, and that her declaration in said suit, after alleging that prior to said accident she was a strong, healthy and able-bodied woman, earning and capable of earning a substantial income, contained the following allegations with respect to the injuries alleged to have been suffered by her in that accident:

''Plaintiff was violently thrown and jostled about in said taxicab, and there were thereby inflicted upon her many painful and permanent bodily injuries. She was bruised and sprained about the head, limbs and body, her abdomen was bruised, her spine twisted and strained, her internal organs were misplaced and the proper functioning thereof disturbed. As a result of said injuries, plaintiff suffered much excruciating pain and mental anguish, and will hereafter suffer much pain and mental anguish, some of said injuries being permanent.''

It further alleges that said suit against Memphis Street Railway Company was tried on September 30, 1946, and that the respondent testified therein that she had never had any trouble with her back prior to said accident on April 25, 1944, but that when confronted with a sworn petition for divorce filed by her in 1937 alleging that in 1935 she had sustained a sacroiliac strain for which she was forced to wear a heavy and uncomfortable brace for a year or more thereafter, she admitted said prior back injury; that she testified on said trial that as a result of said accident on April 25, 1944, she had suffered and

continued to suffer a great deal of pain and aching and that she was still under the care of Dr. Henry G. Hill, an orthopedic surgeon of Memphis, and that she had not been able to resume all the duties of her profession and that all of said pain and disability resulted from said accident; that in said trial she did not disclose the fact that she had been involved in the accident in Knoxville and received similar injuries therein until she was confronted upon cross-examination by counsel for Memphis Street Railway Company with the declaration filed therein; and that, when asked the name of doctors who had treated her since the 1944 accident, she failed to disclose the fact that Dr. Vernon I. Smith of Knoxville had treated her for injuries sustained in said Knoxville accident.

The bill further alleges that notwithstanding the fact that she had been under the treatment by Dr. Hill from March, 1946, to the time of said trial, she failed to disclose to him that she had received similar injuries in the Knoxville accident and had been treated for the same by Dr. Smith, nor did she disclose to Dr. Smith that she had received injuries to her back, nervous system and female organs in the Memphis accident, and from which she testified that she still suffered and for which she was still receiving treatment at the time of the trial; that she failed to disclose to the attorney representing her in her Knoxville suit that she had a damage suit for similar injuries pending in Memphis, and that she did not disclose to the attorney representing her in her Memphis suit that she had a suit for similar injuries pending in Knoxville until shortly before the trial of the Memphis suit; that a few days before the trial of the Memphis suit, when the respondent was approached by local counsel for the insurance carrier of the defendant in the Knoxville suit for the purpose of arranging for her physical exam-

ination by a Memphis doctor, she stated that she did not have a Memphis doctor but was acting under instructions from Dr. Smith, and this despite the fact that she was then and had been for several months under the care of Dr. Hill for injuries claimed to have been received in the Memphis accident; and that in said particulars the respondent was guilty of bad faith and fraud in the prosecution of both of said suits and that her conduct with respect thereto renders her unfit to be a member of the bar.

The bill further alleges that the respondent was cast in said suit against Memphis Street Railway Company and that on October 1, 1947, she filed in the Circuit Court of Shelby County a petition for a writ of error coram nobis seeking to have the judgment theretofore entered against her in said suit set aside and that said petition, which was verified by the oath of the respondent, is replete with charges of deliberate fraud against Hon. Sam P. Walker, a reputable and respected member of the Memphis Bar, who represented Memphis Street Railway Company in said suit, such charges being directed to the argument made by him to the jury in the trial of said damage suit; that Mr. Walker in all respects conducted himself properly in said trial and that all of the remarks and observations made by him to the jury were legitimate inferences and deductions to be drawn from the testimony, and that respondent's charges of fraud made against him were wholly false and were made by the respondent in an attempt to obtain a personal advantage as a litigant, and reflect a wilful and unconscionable disregard of her duties and responsibilities as a member of the bar and renders her unfit to be a member thereof.

In addition to the above charges growing out of said litigation, the bill charges that, after a hearing thereof by the Board of Directors of complainant, the respondent

announced through the public press of Memphis that she had withdrawn from the practice of law, but that in spite of the same, she has continued to practice, and that she had and was then engaged in the solicitation of accounts and other legal business by circularizing Memphis firms by mail in violation of the statute, and that she has clearly demonstrated by her conduct that she is not qualified to fully understand and appreciate the duties and responsibilities that attend the practice of law and that she is unfit to be a member of the Bar of Tennessee.

The respondent in her answer, which is quite lengthy, admits many of the factual matters charged in the bill, but denies all allegations of misconduct, and goes into great detail in explaining these matters and any unfavorable inferences which might be drawn therefrom. She admits the quoted language of the two declarations and the similarity of the injuries alleged in them, but she avers that the declaration in the Knoxville suit was prepared by her attorney without consultation with her, that she had nothing to do with preparing it, and never saw it prior to the trial of her Memphis suit.

With respect to her testimony relative to never having any trouble with her back prior to her April, 1944, accident, the answer admits that she did so testify and that upon cross-examination her attention was called to the contents of the divorce bill which she filed in 1937 and in which it was averred that her then husband attacked her and caused a sacroiliac strain, but that the error in her testimony was not due to design, but that she had entirely recovered from such injury years before the trial and that she had completely forgotten it. It also admits that in this trial she did not mention on direct examination the fact that she suffered injuries in the accident in Knoxville subsequent to the Memphis accident, but avers

that the injuries received by her in the Knoxville accident were very slight and not connected with the injuries involved in the trial, and further that the matter of the Knoxville accident was known to her attorney, who could and would have developed the same had he considered it good trial strategy to do so, and it denies any intention to conceal these matters from the Court and jury, as well as any effort to conceal at the trial the fact that Dr. Smith had treated her for her Knoxville injuries or that she concealed from him her Memphis injuries or that she concealed from Dr. Hill her Knoxville injuries, or that she concealed from the attorney for the insurance company the fact that she was being treated by Dr. Hill for the Memphis injuries, and it denies that she was guilty of bad faith in any of said matters.

The answer admits the filing of the petition for a writ of error coram nobis based upon the discovery of certain X-ray pictures which were not produced at the trial in the Circuit Court, but it avers that it was not her intention to cast personal aspersions or to attack the personal integrity of Mr. Walker, but that she merely charged that she had been defrauded of her legal rights, that in filing the same she acted as a litigant and that said petition as a pleading was privileged and within her constitutional rights of free speech.

In regard to the charges of soliciting legal business, the answer avers that the respondent has not engaged in the practice of law since June 10, 1948, but that upon retiring from the practice, she became Executive Director of Tennessee Merchants and Doctors Bureau, Inc., a corporation engaged in the business of collecting delinquent accounts, and that in such capacity only she had solicited accounts for collection, and it avers that her actions in so

doing are proper and legal and not grounds for disbarment.

During the course of the investigation by the complainant Association of these charges against the respondent, hearings were had before its Executive Committee and also before its Board of Directors, transcripts of the proceedings before these bodies, together with the transcript of the testimony in the Circuit Court trial, being introduced at the hearings, and these, with the testimony of the witnesses examined before the Chancellor, present a clear picture of the facts surrounding the entire matter.

On the afternoon of April 25, 1944, as the respondent was driving east on Poplar Avenue and just after she had passed Cleveland Street, her car was crowded into a parked car by a bus of the Memphis Street Railway Company travelling in the same direction which pulled towards the curb to discharge passengers, resulting in slight damage to her car and jerking and throwing her around in the car. The respondent was very nervous and upset as a result of this collision, as well as being bruised and sore about her body, and the next day she consulted a physician, who prescribed heat and sedatives as well as rest. Her back did not respond to such treatment, so a few days thereafter she consulted Dr. E. J. Lipscomb, a Memphis orthopedic surgeon, who made X-ray pictures of her neck and spine and, finding them negative and believing the injury superficial, he prescribed further physical therapy treatments.

Following this accident, the respondent made an effort to effect a settlement of her claims, but, being unable to do so, on April 18, 1945, she brought suit in the Circuit Court of Shelby County against the Memphis Street Railway Company for $15,000.00 damages, the declaration

filed therein, which was prepared by her, containing the allegations relative to her injuries quoted above.

In August, 1945, and before her suit was tried, the respondent was in Knoxville and, while on her way to the office of Hon. Clyde Key, a highly respected member of the Knoxville Bar, the taxicab in which she was riding made a sudden turn, throwing her to the floor. As was the case with the Memphis accident, the respondent was very nervous and upset over this, and a day or two later, being stiff and sore, she went at Mr. Key's suggestion to Dr. Vernon I. Smith, a Knoxville physician, for examination and treatment, and Dr. Smith, finding that she had suffered no serious injuries, prescribed sedatives and physical therapy. After remaining in Knoxville for a few days the respondent went to Gatlinburg and while there had a severe sinus infection, and as a result of her injuries, her illness and the intense heat in Memphis, she remained at Gatlinburg about a month, during which time she was treated at frequent intervals by Dr. Smith.

During the following winter, the respondent's back continued to trouble her, and in March, 1946, she consulted Dr. Henry G. Hill, another Memphis orthopedic surgeon, who made X-ray pictures of her spine and found that she was suffering from spondylitis, a type of arthritis of the spine, and advised the wearing of a rather uncomfortable brace, which advice, however, was not followed by the respondent.

In the meantime, Mr. Key, who had been employed by respondent to handle her Knoxville damage claim, had been negotiating with the attorneys for the insurance carrier of the taxicab operator relative to a settlement, but had been unable to obtain a medical report from Dr. Smith, but did receive this report shortly after July 23, 1946, and, there not being time to conclude the settlement

negotiations before suit would be barred by limitation, Mr. Key brought suit against the operator of the taxicab for $25,000.00. Dr. Smith's report showed, among other things, that his examination showed spasticity of the muscles of the neck, back and shoulder girdle and that in his opinion, the injuries of the respondent consisted of "shock, severe bruises and contusions to the soft parts of the body, together with sprains to numerous joints, severe and persistent neurosis, which has persisted into a post traumatic type bordering on hysteria. There has also been a change in her menstrual cycle, probably due to a crushing of the pelvis and concurrent neurosis", and from this report Mr. Key drew the declaration and made the allegations with respect to her injuries set out above.

After filing this suit, Mr. Key wrote the respondent that a copy of the report had been turned over to counsel for the insurance company, who would probably want to have her examined by a Memphis physician, and since there would not be time to dispose of the matter before the statute would run, he was filing a suit for $25,000.00 damages. The respondent was very much upset when she received Mr. Key's letter advising her of the filing of the suit, and she immediately replied by writing to him as follows:

"Dear Clyde:

"Thank you for your letter of July 27.

"If you have not already filed the suit in my maiden name, it occurs to me that it might be advisable to use the name 'Mrs. Anthony A. Aspero' as plaintiff, since I am now married.

"I was truly amazed at the amount of ad damnum you have chosen and suggest you name a much smaller figure, if the suit has not already been filed. To be perfectly

candid with you, I am very vexed that your procrastination in obtaining Dr. Smith's report has rendered the filing of a suit necessary. This may cast a reflection on me and cause me to be accused of being a chronic litigant.

"Now that we must be in court, I want you to get all you can out of this claim for me. Certainly we should obtain a sufficient amount to cover my medical bill and drug bill, as well as enough to reimburse me for my expenditures during my stay at that expensive but beautiful resort of Gatlinberg.

Sincerely yours,"

Up to this time, Mr. Key had not been informed of the fact that the respondent had been involved in an accident in Memphis and, being unable to understand her reason for writing him such a letter, he telephoned her from Nashville a few days later and asked her what she meant by it, whereupon the respondent told him of her Memphis accident and of her pending suit to recover damages for the injuries which she sustained in it.

After filing her Memphis suit, the respondent employed Canada, Russell & Turner, a very eminent and respected law firm of the Memphis Bar, to represent her, the matter being handled by Hon. Cooper Turner, Jr., a member of this firm. As has been stated, the Street Railway Company was represented by Mr. Walker and after several abortive efforts to reach a compromise, in the course of which Mr. Walker offered to pay $750.00 in settlement, the case came on for trial on September 30, 1946.

A few days before that date, the attorneys for the insurance carrier of the Knoxville taxicab operator advised Hon. Marx Borod, another prominent Memphis attorney, of the suit pending in Knoxville, and requested him to arrange a physical examination of the respondent, and, in talking to her with reference to such examination,

Mr. Borod inquired whether she had been treated by a local physician, and respondent replied that she had not, but that she had been treated by Dr. Vernon I. Smith of Knoxville. Mr. Borod then contacted Dr. Alphonse Meyer, also an orthopedic surgeon, about examining the respondent and, when Dr. Meyer informed him of the Memphis accident and suit, he then contacted Mr. Walker and advised him of the Knoxville accident and suit. At this time, the respondent had not advised her attorney, Mr. Turner, of the Knoxville accident and suit, but two or three days before the suit, as a result of a conversation between him and Dr. Meyer, Mr. Turner inquired of her about it and asked to see a copy of the declaration filed, and she stated that she did not have a copy of it but that the Knoxville matter did not involve the same injuries as were presented in the Memphis suit.

In her testimony in the suit against the Street Railway Company, the respondent was not asked and did not mention on direct examination the Knoxville accident, but on cross-examination she readily admitted that she had a $25,000.00 damage suit pending there against the taxicab company, but denied having seen the declaration or that she knew what statements were made therein relative to her injuries. Also, after testifying that she had never had any trouble with her back or any sacroiliac trouble prior to the accident, she admitted on cross-examination, when confronted with the divorce bill which she had filed in 1937, that her former husband had knocked her across a dresser in 1935 and hurt her back and that she wore a brace or corset for some months thereafter, her explanation of this contradiction being that the incident had happened over ten years before and that she recovered from these injuries in a short time, and that she had forgotten about it.

22

The case of the complainant with respect to the first charge made against the respondent rests upon certain circumstances disclosed by the record, which it insists warrant the conclusion that the respondent attempted to perpetrate a fraud upon the Circuit Court in her case against the Street Railway Company, these circumstances being as follows:

(1) The declaration in the Memphis case and in the Knoxville case contain practically identical averments as to injuries, except possibly with regard to back injuries alleged in the Memphis case.

(2) The respondent, when examined by Dr. Smith for the injuries received in the Knoxville accident, failed to disclose to him that she had received substantially the same injuries in her Memphis accident.

(3) She failed to disclose to Dr. Hill, when examined by him for her back injuries alleged to have been received in the Memphis accident, that she had also been injured in the Knoxville accident.

(4) She failed to disclose to Mr. Key that she had been injured in the Memphis accident and that she then had a damage suit pending as a result of it.

(5) She failed to disclose to Mr. Borod, when he talked to her about a physical examination in regard to the Knoxville accident, that she was being treated by Dr. Hill.

(6) She failed to disclose on said trial the fact that she had been injured in the Knoxville accident and treated by Dr. Smith for her injuries and that she had a damage suit pending to recover for injuries alleged to have been received in it until confronted upon cross-examination with a copy of the declaration.

(7) She testified on the trial of the case against Street Railway Company that she had never had any back or

sacroiliac trouble prior to the accident with its bus, when in fact she received back and sacroiliac injuries at the hands of her former husband some years ago.

The record establishes the indisputable truth of each of the foregoing circumstances, and absent explanation and standing alone, the conclusion that the respondent did attempt to perpetrate a fraud upon the Court would be inescapable.

However, we think that the respondent has successfully and satisfactorily explained these circumstances and thus rebutted the inference of guilt which would otherwise arise therefrom, and that the respondent's third assignment of error, which is directed to the action of the Chancellor in finding that she did attempt to perpetrate a fraud upon the Court must be sustained.

Considering these circumstances, it is evident that, while the two declarations do set out almost identical injuries, the responsibility for this cannot be placed upon the respondent, for she testified that she had nothing to do with the preparation of the declaration in the Knoxville case and did not know what it contained until a copy was shown to her on the trial of the Memphis case, and, in this, she is not only not contradicted by anyone, but is corroborated by Mr. Key, whose testimony on that point is as follows:

"Mr. Martin: Mr. Key, which one of those two letters of yours, if either one of them, enclosed a copy of the declaration to her?

"Mr. Key: I have never to this day sent her a copy of this declaration. Not to this day. I prepared that declaration with Dr. Smith's report before me, with her brief statement to me on the 18th of August, 1945 as to how the accident happened. I have never sent her a copy of that declaration.

"Mr. Ballon: Did she ever disclose to you, Mr. Key, whether or not she was injured or what injury she was complaining of?

"Mr. Key: No, she did not.

"Mr. Ballon: She never did?

"Mr. Key: As I say, when she came in that Saturday afternoon, she was practically hysterical. I didn't attempt to ask her where she was injured. I talked to her a while and reached a conclusion that her injuries were of no consequence. Then on the following Monday morning, when she came in complaining of being sore all over, I thought it advisable to have an examination. And then I sent her to Dr. Smith.

"Mr. Ballon: She didn't state to you her arm, leg or any part of her body is just sore all over?

"Mr. Key: No. There is a whole lot in this record, and I have read the entire proceedings here except the hearing in December, and there is a lot of complaint about my alleging a back injury. You can read my declaration and the word 'back' doesn't appear in it. Dr. Smith, in his report, said that she was complaining of pains in the neck. My declaration alleges that her spine was twisted. And you will find that stock allegation that she was 'bruised and sprained about the head, limbs and body', that I put in every declaration that I ever filed in a personal injury case. But I did not allege any back injury and she never claimed any in that accident.

"Mr. Ballon: That answers my question, Mr. President.

"Mr. Key: I feel very strongly that if there is any criticism whatever about the handling of that Knoxville case that criticism should be directed to me and not to Miss Sanders. Because I didn't get the Doctor's report until the last minute, I had to file the suit after the attorneys on the other side told me that we could not

complete our negotiations before the statute expired. I prepared that declaration. I filed it. I signed the cost bond. I didn't submit it to her, and, as far as I know, she never saw it until it was sprung on her at the trial of the Memphis case. And if I exaggerated in that declaration, it was my exaggeration and not hers. What else she has done, I don't know, but I feel deeply that she is not subject to any criticism on account of that Knoxville litigation.''

In the light of this testimony, it is difficult for us to see how the respondent could be more completely exonerated from responsibility for the similarity of the allegations of the two declarations.

Nor does it appear that her failure to inform Mr. Key of her Memphis accident and the pendency of the suit against the Street Railway Company was intentional or purposeful, for upon receipt of his letter advising her that he had brought suit for $25,000.00, she immediately wrote him and protested both the bringing of the suit on the grounds that she might be accused of being a chronic litigant, and also the amount of ad damnum, and in a telephone conversation a few days thereafter, she told him about the Memphis suit, which was, in our opinion, thoroughly inconsistent with the idea of a deliberate withholding of this information from him, and in fact, completely negatives such an intention.

We attach no great significance to the fact that when Mr. Borod called the respondent to arrange a physical examination to determine the extent of the injuries which she had received in the Knoxville accident, she made no mention of the fact that Dr. Hill had treated her for her back trouble, for it is clear, both from her testimony and from that of Mr. Borod, that Mr. Borod was only interested in ascertaining whether she had been treated by a

Memphis physician for her Knoxville injuries, for, after testifying on direct examination that the respondent, when being asked if she had a physician here, stated that she hadn't had a physician in Memphis but had been acting under the instructions of Dr. Vernon Smith of Knoxville, Mr. Borod testified on cross-examination as follows:

"Q. Mr. Borod, when you asked Miss Sanders if she had a physician and she said no, what type of physician were you speaking of,—a general practitioner? A. I was speaking of anybody that was a medical physician that might have treated her for this injury that she had alleged in this lawsuit.

"Q. The lawsuit in Knoxville? A. That is correct.

"Q. And she said 'No,' she had none here for that, but she had Dr. Smith— A. She didn't say 'for that,'— she said she had no doctor.

"Q. You asked her about a doctor for that injury? A. I was asking her when she had had a doctor treat her for the injury she had alleged to have occurred in Knoxville.

"Q. She said, 'No, nobody except Dr. Smith?' A. Dr. Smith.

"Q. Whom you already knew about? A. That is correct."

In this situation, since Dr. Hill had not treated her for the Knoxville injuries, and since treatment for those injuries was the subject of the conversation, we fail to see how any unfavorable inference arises from her failure to mention to Mr. Borod that Dr. Hill had treated her for other injuries.

Coming now to the failure of the respondent to disclose on direct examination in the trial of her suit against the Street Railway Company that she had received injuries in the Knoxville accident and had been treated by Dr.

Smith therefor, her testimony is that the question of mentioning this matter in her direct examination was discussed between her and Mr. Turner prior to the trial, and as a matter of trial strategy, it was agreed that since there was no connection between the two matters, the Knoxville accident would not be mentioned unless she was asked about it by counsel for the defendant. Mr. Turner was not questioned upon this point and therefore neither directly corroborates nor contradicts the respondent's statement; however, he did testify that he knew about the Knoxville accident at the time of the trial, and his failure to question the respondent about it on her direct examination would seem to afford corroboration of her testimony.

In addition, Mr. Turner's testimony strongly refutes the idea that the respondent intentionally concealed these facts or tried to perpetrate a fraud upon the Court, the pertinent parts of his testimony being as follows:

"Mr. Turner: My impressions of the matter—that is what I say consists of some impression and some facts; I do not believe that Miss Sanders was guilty of perjury. Miss Sanders was involved in two major contradictions in the testimony in this lawsuit. They both have been presented here. One was in connection with the back injury forming the basis of the divorce case, and the other was the allegation of back injury in the declaration in the Knoxville suit. In my opinion, Miss Sanders' testimony with respect to the Knoxville matter is completely borne out by Mr. Key's affidavit. She testified that she did not see that declaration and that she did not know that there was any charge of a back injury in that declaration. At the trial there was presented a copy of the letter of Dr. Smith, the Knoxville physician, giving his finding of her injuries from the taxicab accident.

There is no mention in that letter at all of any back injury. And her testimony, also, that she assumed that if that charge was in the declaration, as it developed it was, that Mr. Key had put it in there himself and on his own responsibility. This is borne out by his affidavit, as we had it a minute ago.

"In addition to that, when Miss Sanders spoke with me about this Knoxville matter shortly before the trial, I asked her at that time whether the matter involved the same injuries, and I asked for a copy of the declaration. She stated to me, at that time—this was the morning before the trial—that did not involve the same injuries; and she also stated she did not have and had not had a copy of the declaration. I do not recall that she said she had not seen it. She said she did not have it and had not had it. In my opinion that particular charge is completely baseless.

"With reference to the charge growing out of the divorce suit, the matter was not brought to my attention or discussed in any way until it developed during the trial, and all that I can say about it is an impression. Her explanation was that it was a matter which had long since terminated her injury and that it had not been on her mind, that she had no trouble with it during the intervening years, and that was the reason she had not thought of it as a prior back injury. I think that that is a reasonable explanation for a normal human being. I think that if people have injuries ten or twelve or fifteen years before and those particular injuries are not called specifically to their attention, they may very well forget them momentarily. That, in my opinion, is borne out by Dr. Lipscomb's deposition. Dr. Lipscomb testified that that injury had long since been years before, and there was no subsequent trouble from it. So that there was

nothing to recall it to her mind unless something jumped into her mind in response to Mr. Walker's question. Nobody knows whether it was in her mind or wasn't, but I think a reasonable explanation of it is what she gave; that she had forgotten it completely. . . ."

"Chairman Winchester: Mr. Turner, do you recall how long it was before the trial of the street car case Miss Sanders first acquainted you with the fact that she had a law suit pending in Knoxville?

"Mr. Turner: Mr. Winchester, that matter happened in this way. I think this case was set on Monday, and on either late Friday or Saturday morning, rather Friday evening, I think it was, I went to Dr. Meyers to ask him if he would testify in this case as an expert in connection with reading certain x-rays only. Dr. Meyers did not want to do it and he gave as the reason for not wanting to do it that he had, I think, been called by Miss Sanders following this street car accident to come and see her; and that he either came and saw her and wasn't impressed with her injuries or he didn't go. I have forgotten which. During the course of that conversation, he said casually that he was also called upon to examine her for another matter, that is, at that time. I asked him what it was and he said that he didn't care to disclose it. In other words, it wasn't my business but his business as a doctor. When I talked with Miss Sanders, I am certain it was Friday evening, it was very near closing hours that I talked with her on the phone, that matter was mentioned and I had no particular reason to discuss it with her other than saying that Dr. Meyers had said something about it and I wanted to know what it was. We didn't discuss it at that time because we didn't have much time to discuss it on the phone. And she said she would talk with me on Monday morning about it. When she

came in Monday morning we talked about it very shortly before going to the court house, and at that time I found that there was matter growing out of an accident in Knoxville, and that was a suit filed. And that was when we discussed what the injuries were and I asked for a copy of the declaration, and she said she had not had one and did not have one, and she said the injuries were not the same.

"Mr. Martin: Did she tell you she had this doctor up at Knoxville treating her for about a month from August, 1945?

"Mr. Turner: I don't think so John. I don't think there was any discussion of what doctor treated her or not. I would assume, I am sure I did assume, that some doctor treated her or examined her. But there was no discussion about the details of the examination or treatment or who it was or how long it was or anything like that sort of thing. The primary consideration, which I had at that time, was whether or not the Knoxville matter in any way involved the same injuries which were presented here. She said that they did not. I asked her for the declaration and she did not have a copy of it. I took her word for it that she had not. I saw no reason not to. And I think she was borne out in that position by the later developments in this case. . . ."

"Mr. Gianotti: Tell me, based on fact, if you can, what Miss Sanders demeanor was when this question was asked, as to whether or not she was trapped, expected the questions would lead up to this situation, what was her demeanor when that situation arose, if any?

"Mr. Turner: She didn't give any indication of being trapped. I think that she gave some impression of being confused and excited. That, to me, didn't give me any particular impression of any understanding of anything

definite at all. I think that from the Jury's standpoint she had given an impression that she had no back injury, outside of this matter in answer to Mr. Walker's questions. And when he produced this declaration and also this divorce suit, there was a complete contradictory impression to the jury and I think that it confused Miss Sanders just as any witness who didn't have those things on her mind. I don't see how she could have been other than confused when she had no impression or no claim made that she had a back injury in the Knoxville matter. Yet she was confronted with a declaration in that suit which said she did have a back injury.

"Mr. Gianotti: As near as you remember, Dr. Lipscomb makes no mention at that time about this previous injury?

"Mr. Turner: I can't swear to that.

"Mr. Gianotti: Whether or not Miss Sanders' attention should have been directed to the divorce injury by anything that transpired between Dr. Lipscomb and Miss Sanders, in other words, should have had it on her mind at the time she was questioned?

"Mr. Turner: I would say there was nothing in Dr. Lipscomb's deposition to that effect, but I couldn't swear to that because I haven't read it since the trial."

The respondent ascribes her failure to mention in her testimony the back injuries inflicted upon her in 1935 by a former husband and the consequent wearing of a brace for some months thereafter, to the lapse of time intervening and to a faulty memory. Her testimony as to this, while not thoroughly satisfactory or convincing, is not so inherently improbable as to justify its outright rejection, especially since her testimony upon other vital matters is corroborated by that of Mr. Key, Mr. Turner and Mr. Borod, all unimpeachable witnesses.

The only circumstances remaining to be considered are the failure of the respondent to advise Dr. Smith of her Memphis injuries and to advise Dr. Hill of her Knoxville injuries. Giving to these matters their highest probative force, and discarding the testimony of the respondent relative to them, the most that can be said for them is that, if the other circumstances relied on were satisfactorily proved, they would amount to indicia of guilt, but since, in our opinion, unfavorable implications arising from these other circumstances have been refuted, the fact that she failed to mention to either doctor any other injuries is wholly inadequate, standing alone, to establish her guilt.

We are, therefore, unable to concur in the finding of the learned Chancellor that the respondent is guilty of attempting to perpetrate a fraud upon the Court or against the Street Railway Company and, holding as we do that a preponderance of the evidence shows that she is not guilty of this offense, her third assignment of error is sustained.

The second assignment of error is directed to the finding of the Chancellor that, in a petition for a writ of error coram nobis filed by her seeking a retrial of said suit, the respondent falsely and maliciously accused Mr. Walker of fraud in the trial.

As stated above, shortly after the respondent's accident, Dr. Lipscomb made X-ray pictures of her back, and when she went to Dr. Hill for examination she got these pictures from Dr. Lipscomb and turned them over to Dr. Hill. At the trial she testified to these facts and also stated that she returned the pictures to Dr. Lipscomb; however, in his deposition taken by her several months before the trial, Dr. Hill testified that he had never seen these pictures and Dr. Lipscomb, in his dep-

osition taken during the trial, testified that the respondent had not returned the pictures to him, and with the record in this situation, Mr. Walker, in his argument to the jury, commented both upon the discrepancy in the testimony and upon her failure to produce these pictures.

Following the jury verdict, the respondent made no motion for a new trial and apparently decided to let the matter drop; however, in 1947, after the complainant Association had commenced its investigation and these X-ray pictures began to play a prominent part in the investigation, the respondent went to Dr. Hill's clinic to obtain his affidavit about them, and the pictures were, to the surprise of both the respondent and Dr. Hill, found in Dr. Hill's file. It is clear from the testimony that, when giving his deposition, Dr. Hill had forgotten that the pictures had been turned over to him or that he had examined them, and the respondent was mistaken about having returned them to Dr. Lipscomb.

Upon making this discovery, the respondent apparently conceived the idea that her failure to produce these pictures was the major, if not the sole cause of the jury verdict against her, and she accordingly prepared and filed in the Circuit Court a petition for a writ of error coram nobis based in part upon the discovery of the pictures, in which she charged that Mr. Walker, in arguing the case to the jury, was guilty of deliberate fraud, this allegation being made not once but several times.

We have examined the record of the trial, including Mr. Walker's argument to the jury, and not only was he not guilty of any fraud or improper conduct, but he is to be commended upon the zeal and skill with which he represented his client, and we concur in the finding of the Chancellor that not the slightest justification for that

charge against him, either personally or professionally, existed in this record.

We also concur in the finding of the Chancellor that these charges were made maliciously. It is immaterial whether they were made, as found by the Chancellor, in order to start a sort of back-fire against the investigation then being conducted by the complainant, or whether they were made as a reprisal against Mr. Walker for having brought the matter to the attention of the complainant Association, or whether, as appears most likely from the record, the respondent concluded that a writ of error coram nobis would not lie unless fraud be charged and was willing to and did make these false charges to carry her point, for the result would be the same in either event. It is sufficient to say that the respondent undertook to use the processes of the Court to falsely and maliciously degrade and defame a fellow member of the bar.

That such conduct is within the purview of Sub-section (5) is settled by the opinion of Supreme Court in the case of State v. Bomer, 179 Tenn. 67, 162 S. W. (2d) 515, 521. In this case, Bomer was found guilty of falsely and maliciously initiating disbarment proceedings against two members of the Memphis Bar and the Court, in holding that such conduct constituted a disbarrable offense, said:

"That the Court has the power, independent of statute, to enter a decree of disbarment for wrongs against the integrity of individual members of the bar, cannot be denied, especially so when committed with wilful and malicious intent. It is essential to the orderly administration of justice and for the preservation of its own dignity and honor that the officers of the court should be honorable in their dealings, not only with the court but with each other."

The respondent undertakes to take the case out of the rule laid down in the Bomer case by contending that she acted in her capacity as a litigant and not as counsel, but we find it unnecessary to decide whether this would constitute a defense for the reason that the record shows that she not only collaborated with Mrs. Berger, who was a law clerk in her office, in the preparation of the petition, but that she also signed it as counsel, thus assuming the dual role of litigant and lawyer.

■ The respondent also contends that said petition as a pleading was privileged and within her constitutional rights of free speech and that to hold that the same constitutes a disbarrable offense would deprive her of her constitutional rights. Under the statute jurisdiction of constitutional questions lies exclusively in the Supreme Court, but in order to deprive this Court of jurisdiction on that account the constitutional question must·be substantial and not incidental.

Tennessee Central Railway Company v. Pharr, 183 Tenn. 658, 194 S. W. (2d) 486.

In State v. Bomer, supra, the Court, in deciding a similar contention adverse to the defendant, said:

"But the constitutional right of free speech, which is so often abused, affords no protection to one who, by malicious acts and words, defames the very tribunal at whose altar he is called to be a minister and whose process he abuses."

In the light of this holding, we conclude that no substantial constitutional question.is presented and that the contention made is without merit.

■■ Neither do we think that the defamatory matter in the petition was privileged, because in order for matters contained in a pleading to be privileged, they must be pertinent to the issues involved in the suit and by

pertinency of matters to the issue is meant probable cause. Crockett v. McLanahan, 109 Tenn. 517, 72 S. W. 950, 61 L. R. A. 914.

■ The Chancellor, after finding the respondent guilty of this charge, fixed her punishment at a reprimand. The case is being tried in this Court de novo, and it is our duty to review, not only the findings of fact, but also the punishment imposed, since, if the Chancellor abused his discretion with regard to punishment, it is our duty to impose such punishment as should have been imposed below. Schoolfield v. Bean, 26 Tenn. App. 30, 167 S. W. (2d) 359.

■ It is no trivial matter for a lawyer to make a baseless charge of fraud against a fellow member of the bar in a pleading filed in court, for not only is the lawyer assailed done a grievous injustice, but such abuse of the processes of the courts tend to bring them into disrepute. The fact that the respondent as a lawyer knew, or should have known this, aggravates her offense, and in our opinion, the punishment of reprimand imposed by the Chancellor is not in keeping with the character of the offense, and that her punishment should be fixed at suspension of the right to practice law for a period of two years, and the decree of the Chancellor will be modified so as to impose that punishment upon said charge.

The respondent also assigns error to the action of the Chancellor in finding her guilty of violating Subsection (2) by soliciting legal business.

The record shows that in June, 1948, the respondent announced through the public press that she had retired from the practice of law, and immediately became Executive Director of the Tennessee Merchants & Doctors Bureau, Inc., a corporation which she had formed shortly before that time, and of which she was the principal

stockholder. Shortly thereafter, she mailed cards to numerous Memphis business concerns announcing her appointment and soliciting their accounts for collection, these cards containing her name in large letters and referring to her as a well-known Memphis attorney.

In our opinion, the formation of this corporation and its employment of the respondent was a mere subterfuge to enable her, in soliciting accounts for collection, to acquaint these concerns with the fact that she was a lawyer and to secure business on the strength of it, and we concur in the finding of the Chancellor that she is guilty of soliciting legal business, so this assignment of error is overruled.

The Chancellor imposed a reprimand as punishment for this offense, and finding no abuse of discretion therein, his action in that respect will not be disturbed.

It follows, therefore, that the decree of the Chancellor, as modified in the respects indicated herein, is affirmed at the cost of the respondent and her sureties on her appeal bond herein.

Anderson, P. J., and Swepston, J., concur.